IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

```
───────────────────────────────
                              :
BOARDWALK REGENCY CORPORATION, :    HON. JEROME B. SIMANDLE
                              :
            Plaintiff,        :    Civil No. 08-0016 (JBS)
                              :
      v.                      :
                              :        OPINION
UNITE HERE LOCAL 54,          :
                              :
            Defendant.        :
                              :
───────────────────────────────
```

APPEARANCES:

Michael Barabander, Esq.
Nicole Kristen Manning, Esq.
FOX ROTHSCHILD LLP
75 Eisenhower Parkway
Suite 201
Roseland, NJ 07068
      Attorneys for Plaintiff Boardwalk Regency Corporation

Joseph T. Cleary, Esq.
Cassie Eherenberg, Esq.
CLEARY & JOSEM, LLP
One Liberty Place
1650 Market Street
51st Floor
Philadelphia, PA 19103
      Attorneys for Defendant Unite Here Local 54

**SIMANDLE**, District Judge:

I.    **INTRODUCTION**

This matter is before the Court upon the parties' cross-
motions for summary judgment [Docket Items 14 and 17].  Plaintiff
Boardwalk Regency Corporation ("Boardwalk" or the "Employer") and
Defendant Unite Here Local 54 ("Unite Here" or the "Union") are
parties to a collective bargaining agreement (the "CBA" or
"Agreement") governing the terms and conditions of employment of

certain employees at the Ceasars Atlantic City casino owned and
operated by Plaintiff.  After a dispute arose between Boardwalk
and Unite Here concerning certain gratuities to which the
casino's doormen, represented by Unite Here, believed they were
entitled, a member of the Union filed a grievance pursuant to the
CBA with the American Arbitration Association.  The matter was
referred to a mutually selected arbitrator, Robert Kyler (the
"Arbitrator"), who, following the presentation of evidence and
arguments by both parties, issued a written award sustaining the
Union's grievance.

Following the issuance of the arbitration award, Boardwalk
filed this lawsuit, in which it seeks to vacate the arbitration
award on the grounds that the award does not draw its essence
from the CBA and that the Arbitrator exceeded the authority
afforded to him under the CBA and the Union's grievance.  The
Union filed a counterclaim, seeking to enforce the arbitration
award.  Each party has moved for summary judgment.  The principal
issue is whether the Arbitrator's two main conclusions – that
Boardwalk terminated the Memorandum of Understanding and violated
the CBA when it determined to no longer assign doormen to load
and unload buses, and that Boardwalk thereby breached its duty of
good faith to the Union – derive their essence from the parties'
CBA, within the narrow review of such arbitration awards under
the Federal Arbitration Act.

As the Court explains below, although it is mindful of the "very limited" degree of judicial review to which labor arbitration awards are subject, <u>Major League Baseball Players Ass'n v. Garvey</u>, 532 U.S. 504, 509 (2001), the Court is constrained to conclude that the award in this case does not draw its essence from the CBA, and will accordingly grant Plaintiff's motion for summary judgment and deny Defendant's cross-motion for summary judgment.

## II.  BACKGROUND

### A.  Facts

#### 1.   The Parties' Agreement and the Dispute over Doorman Gratuities

The material facts are not in dispute.  Plaintiff Boardwalk owns and operates the Caesars casino located in Atlantic City, New Jersey.  (Joint Stip. ¶ 1.)  Defendant Unite Here is the collective bargaining agent for multiple employee units at the Caesars casino, including the casino's doormen and bellmen.  (<u>Id.</u> at ¶ 3.)  Boardwalk and Unite Here are parties to a CBA, which is effective between November 3, 2004 through September 14, 2009, (<u>id.</u> at ¶ 4), and a Memorandum of Understanding ("MOU"), which was signed originally in 1988 and which has been renewed as part of the parties' CBA in each agreement since 1988.  (<u>Id.</u> at ¶ 5.)

The dispute in this case concerns Plaintiff's assignment of doormen to load and unload tour buses, and the gratuities that doormen received from such assignments.  The CBA and the MOU each

3

contain provisions that bear upon this issue.  First, as a
general matter, Article 3, Section 1 of the CBA provides that
"[t]he Employer shall have the sole right to direct and control
its employees.  The Employer reserves the right, which is hereby
recognized by the Union, to schedule . . . [and] assign . . .
according to the requirements of the business and according to
skill and efficiency, giving proper and adequate consideration of
seniority as hereinafter defined."[1]  (CBA, reproduced in Compl.
Ex. A, at 9.)

> With regard to the gratuities owed to doormen and bellmen
for the loading and unloading of tour buses, the CBA states:

> In all package plans, tour deals, or prearranged bus
> tours where guests stay overnight, the gratuity per
> person, in and out[,] shall be as follows:
>
> > Effective 9-15-04    $3.50
>
> The above gratuity shall be shared by bell person, bell
> captain and doorperson, where applicable.

(Id. at 43.)  The parties' MOU addresses the issue in greater
detail, and, owing to its importance in this matter, is set forth
in full below:

> This will confirm the understanding between Caesars
> Atlantic City and H.E.R.E., Local 54 concerning Article
> XV, Section 5(a) of the Collective Bargaining Agreement.
> In all package plan tour deals, or prearranged bus tours

---

[1]  Additionally, the CBA provides that it "supersede[s] any
other contract between the Employer and the Union," and that
"[a]mendments, additions and/or deletions to this Agreement . . .
will be null and void unless in writing and signed by the Parties
hereto."  (CBA at 63.)

where guests stay overnight, the gratuity per person, in and out[,] shall be divided between Bellmen and Doormen when both classifications load or unload the tour bus.

1.    At Management's discretion, Doormen and Bellmen may both work to load in or out a Bus Tour.

2.    The gratuity shall be divided as follows:

| 9-15-99 $2.75 | Bellmen  $2.35 |
|---|---|
|               | Doormen  $.40  |
| 9-15-00 $3.00 | Bellmen  $2.57 |
|               | Doormen  $.43  |
| 9-15-01 $3.25 | Bellmen  $2.78 |
|               | Doormen  $.47  |
| 9-15-02 $3.50 | Bellmen  $3.00 |
|               | Doormen  $.50  |

3.    When Bellmen and Doormen load in or out a bus tour the responsibility of each classification shall be as follows:

Bellmen:  Responsible for luggage between guest room and storage area.  Bellmen are also responsible to properly identify luggage.

Doormen:  Responsible for luggage between storage area and bus.

4.    This agreement is accepted by Caesars Atlantic City and H.E.R.E., Local 54 without precedent established and may not be used or cited in any grievance, arbitration or other proceeding except to enforce its own terms.

(MOU, reproduced in Compl. Ex. B.)[2]

---

[2]  The language quoted above is from the MOU from 2000.  As the discussion above makes clear, the parties have renewed the MOU as part of each CBA since 1988.  (Joint Stip. ¶ 5.)  The record contains a copy of the 1988 MOU, (Compl. Ex. D at 7), which is similar in all relevant respects to the version quoted above.

Between 1988 and 2004, Boardwalk assigned bellmen and doormen to load and unload tour buses, and the bellmen and doormen divided the gratuities consistent with the figures set forth in the MOU.  (Cleary Cert. Ex. H.)  On December 12, 2004, however, Boardwalk, through a letter from Eli Bradford, Front Services Manager for the Caesars casino, informed the doormen that "[a]s of December 12, 2004 the Ceasars Atlantic City[] Doormen will no longer [b]e involved in the loading or unloading [of] buses at Ceasars Atlantic City."  (Compl. Ex. D at 4.)

    2.   <u>Arbitration</u>

On December 13, 2004, Eddie Krause, a doorman at the Caesars casino, filed a grievance notice in which he objected to Plaintiff's decision to cease assigning doormen to load and unload tour buses.  (Compl. Ex. C.)  According to Mr. Krause's grievance notice, "[m]anagement has unilaterally changed the structure of the Bellmen/Doormen gratuity split and has assigned duties that fall under Doormen jurisdiction to the Bellmen." (<u>Id.</u>)  Mr. Krause described the remedy he desired as follows: "Cease and desist.  Revert to 18[-]y[ea]r practice of Doormen loading [and] unloading buses and junkets.  Make whole all affected Doormen."  (<u>Id.</u>)  After Boardwalk denied Mr. Krause's grievance, the dispute was referred to arbitration before

Arbitrator Kyler.[3]   (Joint Stip. ¶ 9.)

The Arbitrator heard evidence over the course of a two-day hearing on July 26, 2006 and January 22, 2007.  (<u>Id.</u>)  At the hearing, the Union presented evidence concerning the history of the doormen's work at Caesars and the Union's expectations concerning the 1988 MOU.  In particular, the Union's witnesses testified before the Arbitrator that between 1979 and 1988, the doormen were responsible for writing valet tickets at Caesars, from which they received tips, but that in 1988, Caesars began to receive a heightened number of visitors via bus tours, and required additional employees to load and unload buses.  (Cleary Cert. ¶¶ 3(c)-(d).)  Accordingly, in 1988, the Employer and the Union agreed, through the MOU, that doormen would assist bellmen in the loading and unloading of buses, and would receive a percentage of the gratuities earned from such activities.  (<u>Id.</u> at ¶ 3(f).)  According to the testimony the Union presented to the Arbitrator, "[t]he Doormen agreed to give up the distribution and processing of valet parking tickets in exchange for this automatic guaranteed gratuity split for all tour buses"; that is, although the matter of valet tickets is not referenced in the

---

[3]  Article 5 of the parties' CBA sets forth the procedures governing the submission of a dispute to arbitration. Significantly, as the Court explains below, Article 5.7(b) of the CBA provides that "[t]he arbitrator shall have no authority to alter, amend, add to, subtract from, or otherwise change the terms and conditions of this Agreement."  (CBA at 25.)

MOU, the doormen believed that they relinquished the distribution
of valet tickets as a <u>quid</u> <u>pro</u> <u>quo</u> for receiving via the 1988 MOU
the opportunity to obtain gratuities by loading and unloading
buses.  (<u>Id.</u> at ¶ 3(g).)  The Union's presentation of evidence
before the Arbitrator also indicated that when, in December 2004,
Boardwalk ceased assigning doormen to load and unload buses,
"[t]he basis for this decision was that the Employer was re-
routing most of the bus tours to its other four properties and
away from Caesars . . . so as to promote [Caesars] to its 'high
roller' clientele."  (<u>Id.</u> at ¶ 3(h).)

On October 25, 2007, the Arbitrator issued a written award
in which he sustained the Union's grievance.  (Arbitrator's
Award, reproduced in Compl. Ex. D.)  In his decision, the
Arbitrator explained his reasoning as follows:

> There is no question that the Memo of Understanding gives
> Management the right to assign bus loading and unloading
> to the employees of their choice.  However, this does not
> give the Employer the right to assign the work that the
> doormen were previously doing before the Memo of
> Understanding to employees who are outside of the
> bargaining unit.
>
> If this were the case, Management could take any clause
> in the Collective Bargaining Agreement and use the
> Management Rights clause to make any clause in the CBA
> ineffective.
>
> The CBA and the Memos of Understanding are the rules by
> which the Union and Management operate for a specific
> period of time and cannot be changed because Management
> wants to eliminate a specific Memo of Understanding.
>
> Nowhere in the Memo of Understanding does it give
> Management the right to deny the Doormen the ability to

maintain their previous wage structure.

This Arbitrator is certainly restricted by the clauses of the CBA and cannot add new provisions to that Agreement. However, an arbitrator has the right to interpret the clauses in the CBA and Memos of Understanding.

(Id. at 5.)  The Arbitrator concluded:

The Employer violated the good faith intent of the parties' signed Agreement when it unilaterally eliminated the gratuity sharing agreement between the Doormen and the Bellmen.  Within two (2) weeks of the receipt of this Award the Employer shall return the writing of the valet tickets to the Doormen.

(Id. at 6.)[4]

## B.   Procedural History

Plaintiff filed its Complaint [Docket Item 1] in this action on January 3, 2008, seeking to vacate the arbitration award. Defendant filed its Answer and Counterclaim [Docket Item 5] on January 18, 2008, seeking to enforce the award.  Thereafter, the parties filed the cross-motions for summary judgment presently under consideration [Docket Items 14 and 17], to the merits of which the Court now turns.

## III. DISCUSSION

## A.   Scope of Review

The parties' cross-motions call upon the Court to determine

---

[4]   The Arbitrator likewise found that the Union's grievance was timely and further concluded that, as to the question of retroactive back pay, the Arbitrator would "retain jurisdiction on the question of retroactivity and place[] the question in the hands of the parties to resolve the issue."  (Arbitrator's Award at 5.)

whether the Arbitrator's award draws its essence from the CBA and whether the Arbitrator exceeded his authority in rendering the award he issued.  The matter is before the Court upon cross-motions for summary judgment pursuant to Rule 56(c), Fed. R. Civ. P., in which summary judgment is appropriate when the materials of record "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  The standard by which the Court decides a summary judgment motion does not change when, as here, the parties file cross-motions.  In re Cooper, 542 F. Supp. 2d 382, 385-86 (D.N.J. 2008).  When ruling on cross-motions for summary judgment, the court must consider the motions independently, Williams v. Philadelphia House Auth., 834 F. Supp. 794, 797 (E.D. Pa. 1993), aff'd, 27 F.3d 560 (3d Cir. 1994), and view the evidence on each motion in the light most favorable to the party opposing the motion.  See Matsushita Elec. Indus. Co., Ltd.  v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

**B.   Analysis**

The Court discusses the especially deferential standard of judicial review of labor arbitration awards, and reviews the Arbitrator's award at issue herein under this lenient standard, in turn below.

1.   Judicial Review of Labor Arbitration

"Judicial review of a labor-arbitration decision pursuant to

10

. . . [a collective bargaining] agreement is very limited."

Garvey, 532 U.S. at 509.  The Court of Appeals has explained:

> [A] court should not "review the arbitrator's decision on
> the merits despite allegations that the decision rests on
> factual errors or misinterprets the parties' agreement."
> [Garvey, 532 U.S. at 509.]  Therefore, if the arbitration
> award draws its essence from the collective bargaining
> agreement, a court should uphold it.  See United Parcel
> Serv. v. Int'l Bhd. of Teamsters, 55 F.3d 138, 141 (3d
> Cir. 1995).  This rule of deference derives from the
> Court's recognition that the parties to the collective
> bargaining agreement "bargained for" a procedure in which
> an arbitrator would interpret the agreement.  See Eastern
> Associated Coal Corp. v. United Mine Workers, 531 U.S.
> 57, 62 (2000).

National Ass'n of Letter Carriers, AFL-CIO v. U.S.P.S., 272 F.3d

182, 185 (3d Cir. 2001).

"Effusively deferential language notwithstanding, the courts

are neither entitled nor encouraged simply to 'rubber stamp' the

interpretations and decisions of arbitrators."  Matteson v. Ryder

Sys., 99 F.3d 108, 114 (3d Cir. 1996).  The Federal Arbitration

Act ("FAA") lists among the circumstances under which an

arbitration award may be vacated cases in which "the arbitrators

exceeded their powers, or so imperfectly executed them that a

mutual, final, and definite award upon the subject matter

submitted was not made."  9 U.S.C. § 10(a).  Thus, "when the

court concludes that the arbitrator has ignored the plain

language of the collective bargaining agreement," National Ass'n

of Letter Carriers, 272 F.3d at 186, that the arbitrator's

decision is "totally unsupported by principles of contract

construction," Exxon Shipping Co. v. Exxon Seamen's Union, 73
F.3d 1287, 1295 (3d Cir. 1996) (citation omitted), or that the
decision does not draw its essence from the agreement because it
cannot "in any rational way be derived from the agreement, viewed
in light of its language, its context, and any other indicia of
the parties' intention," Major League Umpires Ass'n v. American
League of Professional Baseball Clubs, 357 F.3d 272, 280 (3d Cir.
2004) (citation omitted), the court may overturn the arbitration
award.[5]  This is because when "the arbitrator's decision
conflicts with the express provisions of the Agreement between
the Company and the Union," it "fails to draw its essence from
that Agreement." Pennsylvania Power Co. v. Local Union No. 272,
Intern. Broth. of Electrical Workers, 276 F.3d 174, 181 (3d Cir.
2001).  But so long as an arbitrator's decision "reflects an
interpretation of the contract that is at least minimally rooted
in the collective bargaining agreement, and not his 'own brand of
industrial justice,'" Brentwood Medical Associates v. United Mine
Workers of America, 396 F.3d 237, 243 (3d Cir. 2005) (quoting
United Paperworkers Intern. Union, AFL-CIO v. Misco, Inc., 484
U.S. 29, 36 (1987)), the award should not be disturbed.

     2.   The Arbitration Award

    Applying this lenient standard, and acknowledging that

---

[5]  See also United Paperworkers Intern. Union, AFL-CIO v.
Misco, Inc., 484 U.S. 29, 38 (1987) (an "arbitrator may not
ignore the plain language of the contract").

"instances when it is appropriate for a court to vacate the decision of an arbitrator" are "rare," <u>Matteson</u>, 99 F.3d at 114 (citation omitted), the Court is constrained to find that the award at issue in this case does not "draw[] its essence from the collective bargaining agreement," <u>National Ass'n of Letter Carriers</u>, 272 F.3d at 185, and will thus grant Plaintiff's motion to vacate the award and deny Defendant's cross-motion for summary judgment.  In particular, as the Court explains below, the Arbitrator's two principal conclusions – that Boardwalk "terminat[ed]" the MOU when it determined not to assign doormen to load and unload buses, (Arbitrator's Award at 4), and that Boardwalk thereby breached its duty of good faith to the Union, (<u>id.</u> at 6) – are "totally unsupported by principles of contract construction," requiring that the award at issue in this case be vacated.  <u>Exxon Shipping Co.</u>, 73 F.3d at 1295; <u>see also</u> <u>Major League Umpires Ass'n</u>, 357 F.3d at 280 ("Manifest disregard for the CBA is established when the arbitrator's award is totally unsupported by principles of contract construction") (internal quotations and citations omitted); <u>Pennsylvania Power Co.</u>, 276 F.3d at 181.

First, the Arbitrator's conclusion that Boardwalk unilaterally "terminat[ed]" the MOU by ceasing to assign doormen to load and unload buses, (Arbitrator's Award at 4), cannot be supported by the "plain language of the collective bargaining

agreement." National Ass'n of Letter Carriers, 272 F.3d at 186.
As Boardwalk argues, that "plain language" makes clear that it
was within the Employer's right to assign doormen to load and
unload buses, or not to so assign them, as its needs dictated.
Id. First, Article 3, Section 1 of the parties' CBA states that
"[t]he Employer reserves the right, which is hereby recognized by
the Union, to schedule . . . [and] assign . . . according to the
requirements of the business . . ." (CBA at 9.) More to the
point, the specific provisions of the Agreement bearing upon the
assignment of doormen to loading and unloading buses make
unmistakably plain that Boardwalk retained the right to assign,
or not to assign, doormen to loading and unloading buses: the MOU
states that "[a]t Management's discretion, Doormen and Bellmen
may both work to load in or out a Bus Tour," (MOU at 1) (emphasis
added), and it twice emphasizes that the gratuity split applies
"[w]hen Bellmen and Doormen load in or out a bus tour," (id.)
(emphasis added), or "when both classifications load or unload
the tour bus." (Id.) (emphasis added); see also (CBA at 43)
("The above gratuity shall be shared by bell person, bell captain
and doorperson, where applicable") (emphasis added). The
Arbitrator's interpretation of the CBA effectively reads the
above phrase "[a]t Management's discretion" out of the MOU
entirely. See Pennsylvania Power Co., 276 F.3d at 181 (where
"the arbitrator's decision conflicts with the express provisions

14

of the Agreement between the Company and the Union," it "fails to draw its essence from that Agreement").

In order to reach the conclusion contained in the award, the Arbitrator relied on extrinsic evidence of the events preceding the 1988 MOU and the Union's perception that the doormen gave up their valet ticket writing responsibilities as a <u>quid</u> <u>pro</u> <u>quo</u> for receiving the opportunity to obtain gratuities by loading and unloading buses.  That is, the Arbitrator appears to have concluded that the parties had an unexpressed understanding that the Employer could not, consistent with the MOU, decline to assign doormen to load and unload buses without reassigning them the valet ticket writing responsibility they had enjoyed prior to 1988.[6]  Such an approach is likewise "unsupported by principles of contract construction." <u>Major League Umpires Ass'n</u>, 357 F.3d at 280 (citation omitted).  It is, of course, well-settled that "[e]vidence of the circumstances is always admissible in aid of the interpretation of an integrated agreement," and that this is the case "even when the contract on its face is free from ambiguity." <u>American Cyanamid Co. v. Fermenta Animal Health Co.</u>, 54 F.3d 177, 181 (3d Cir. 1995) (quoting <u>Atlantic Northern</u>

---

[6]  <u>See</u> Arbitrator's Award at 5 ("There is no question that the Memo of Understanding gives Management the right to assign bus loading and unloading to the employees of their choice. However, this does not give the Employer the right to assign the work that the doormen were previously doing before the Memo of Understanding to employees who are outside of the bargaining unit.").

Airlines, Inc. v. Schwimmer, 12 N.J. 293, 301 (1953)).
Critically, however, "[t]he admission of evidence of extrinsic
facts is not for the purpose of changing the writing, but to
secure light by which to measure its actual significance."  Id.
(quoting Schwimmer, 12 N.J. at 302).

> Such evidence is adducible only for the purpose of
> interpreting the writing – not for the purpose of
> modifying or enlarging or curtailing its terms, but to
> aid in determining the meaning of what has been said.  So
> far as the evidence tends to show, not the meaning of the
> writing, but an intention wholly unexpressed in the
> writing, it is irrelevant.

Id. (quoting Schwimmer, 12 N.J. at 302) (emphasis added).

The Arbitrator's apparent conclusion that there was an
unexpressed quid pro quo arrangement underlying the 1988 MOU, or
that the Employer's "discretion," (Compl. Ex. B), concerning the
assignment of doormen to loading and unloading work was
restricted by an unarticulated agreement between the parties
concerning valet tickets, relies upon extrinsic evidence to
derive "not the meaning of the writing, but an intention wholly
unexpressed in the writing."  Fermenta, 54 F.3d at 181 (citation
omitted).  That is, the Arbitrator's approach in effect erases,
rather than interprets, the phrase "[a]t Management's
discretion," (Compl. Ex. B), and it conditions the exercise of
such discretion upon a "wholly unexpressed" agreement concerning
the reassignment of valet tickets to the doormen.  Fermenta, 54
F.3d at 181 (citation omitted).

16

Notwithstanding the latitude afforded to a labor arbitrator's interpretation of a CBA, the Arbitrator in this matter was not permitted to amend the CBA by conditioning Boardwalk's discretion in assigning bus loading duties upon the unwritten requirement that it assign valet ticket writing responsibilities to doormen if Boardwalk exercised its contractually authorized discretion.  An interpretation of a CBA that effectively adds and erases language in the agreement does not draw its essence from that agreement.  See National Ass'n of Letter Carriers, 272 F.3d at 186.

The CBA makes clear that it "supersede[s] any other contract between the Employer and the Union," and that "[a]mendments, additions and/or deletions to this Agreement . . . will be null and void unless in writing and signed by the Parties hereto." (CBA at 63) (emphasis added).  Under this provision of the CBA, as well as "principles of contract construction," Major League Umpires Ass'n, 357 F.3d at 280 (citation omitted), the Arbitrator could not rely upon extrinsic evidence to reach an interpretation of the CBA that "conflicts with the express provisions of the Agreement." Pennsylvania Power Co., 276 F.3d at 181.  In short, the Arbitrator's conclusion that Boardwalk unilaterally "terminat[ed]" the MOU by ceasing to assign doormen to load and unload buses, (Arbitrator's Award at 4), and that Boardwalk was under an unexpressed obligation to assign valet

17

ticket writing responsibilities to doormen if it exercised its discretion not to assign doormen to load and unload buses,[7] does not draw its essence from the CBA.  See Pennsylvania Power Co., 276 F.3d at 181.

The Arbitrator's conclusion that, by ceasing to assign doormen to load and unload buses, Boardwalk breached its duty of good faith and fair dealing with the Union likewise cannot be squared with "principles of contract construction."  Major League Umpires Ass'n, 357 F.3d at 280 (citation omitted).  Under New

---

[7]  The Court agrees with Plaintiff that the Arbitrator's error in concluding that the MOU contained an unexpressed quid pro quo condition concerning the assignment of valet tickets resulted in the fashioning of a remedy that was beyond the scope of the grievance submitted by the Union.  See Major League Umpires Ass'n, 357 F.3d at 279 (the scope of an arbitrator's authority "is defined not only by the terms of the CBA, but also by the scope of the issues submitted by the parties").  The grievance in this matter asserted that "[m]anagement has unilaterally changed the structure of the Bellmen/Doormen gratuity split and has assigned duties that fall under Doormen jurisdiction to the Bellmen," (Compl. Ex. C); the matter of valet ticket writing responsibilities was neither referenced in the grievance nor in the Union's framing of the issues in the dispute before the Arbitrator.  (Compl. Ex. D at 3.)  While ordinarily "the arbitrator enjoys a wide latitude in fashioning an appropriate remedy," Int'l Union of Operating Engineers v. Carl A. Morse, Inc., 529 F.2d 574, 580 (7th Cir. 1976) (citations omitted), where, as here, the remedy is premised upon an interpretation of the CBA that is "unsupported by principles of contract construction," Major League Umpires Ass'n, 357 F.3d at 280 (citation omitted), such latitude is inapplicable.  See Pennsylvania Power Co., 276 F.3d at 179.  Because the Arbitrator erred in concluding that Boardwalk breached the CBA − a conclusion which does not "draw[] its essence from the collective bargaining agreement," National Ass'n of Letter Carriers, 272 F.3d at 185 − the remedy fashioned to redress the perceived breach cannot stand.

Jersey law, "[a]lthough the implied covenant of good faith and
fair dealing cannot override an express term in a contract, a
party's performance under a contract may breach that implied
covenant even though that performance does not violate a
pertinent express term." <u>Wilson v. Amerada Hess Corp.</u>, 168 N.J.
236, 245 (2001) (citation omitted).  The New Jersey Supreme Court
has made clear, however, that in the context of contracts that
"vest[] unilateral discretion . . . in one party" – whether to
fix a price, to order a quantity of goods, or to control "other
conditional aspects of a contract" – "[a] party with discretion
may withhold all benefits for good reasons." <u>Id.</u> at 245-46
(quoting Steven J. Burton, <u>Breach of Contract and the Common Law
Duty to Perform in Good Faith</u>, 94 Harv. L. Rev. 369, 384-85
(1980)).  More specifically, the Court has explained:

> The fact that a discretion-exercising party causes the
> dependent party to lose some or all of its anticipated
> benefit from the contract thus is insufficient to
> establish a breach of contract by failing to perform in
> good faith . . . . [The dependent party must instead]
> demonstrat[e] <u>bad motive</u> in order to assert successfully
> a claim of breach of the implied covenant of good faith
> and fair dealing.

<u>Id.</u> (citation omitted, emphasis added).  Thus, while a party that
"exercises its discretionary authority arbitrarily, unreasonably,
or capriciously, <u>with the objective</u> of preventing the other party
from receiving its reasonably expected fruits under the
contract," breaches the covenant of good faith, a party that
exercises its discretion in order to further its own business

19

interests without seeking intentionally to injure its contractual partner does not.  Id. (emphasis added).

The Arbitrator in this case concluded, as a factual matter, that Boardwalk exercised its discretion in not assigning doormen to load and unload buses for business purposes, rather than "with the objective" of injuring the Union.  Id.  In particular, the Arbitrator explained that "Caesars [] decided to reroute all bus tours to its other properties so as to market Caesars to a different clientele . . . . [T]his was done to attract more affluent high rollers, therefore sending the bus tour clientele elsewhere to play the slots."  (Arbitrator's Award at 5.) Indeed, the Union makes clear that its presentation of evidence before the Arbitrator demonstrated that "[t]he basis for [Boardwalk's] decision was that the Employer was re-routing most of the bus tours to its other four properties and away from Caesars . . . so as to promote [Caesars] to its 'high roller' clientele."  (Cleary Cert. ¶ 3(h).)  Despite his finding that Boardwalk acted in furtherance of this business interest rather than out of a "bad motive," Wilson, 168 N.J. at 246, the Arbitrator nonetheless concluded that Boardwalk breached its duty of good faith to the Union, a legal conclusion which cannot be supported under New Jersey law, as the cases reviewed above make clear.  See id.

It bears emphasis that if the Arbitrator had found, as a

20

factual matter, that Boardwalk had acted out of a "bad motive," id., the Court would be in no position to disturb such a factual finding.[8]  See Metromedia Energy, Inc. v. Enserch Energy Services, Inc., 409 F.3d 574, 578 (3d Cir. 2005) ("an arbitrator's improvident, even silly, factfinding does not provide a basis for a reviewing court to refuse to enforce the award") (internal quotations and citations omitted).  Likewise, if the Arbitrator's conclusions regarding the purported unexpressed quid pro quo arrangement between the parties on the matter of valet tickets were based upon an "arguable" construction of the CBA[9] – even one with which the Court disagreed – such a construction would necessarily be upheld.  See Exxon Shipping Co., 993 F.2d at 1291.  This is because the parties to this action "bargained for a procedure in which an arbitrator would interpret the agreement." National Ass'n of Letter Carriers, 272 F.3d at 185 (internal quotations and

---

    [8]  As the preceding discussion makes plain, the Arbitrator made precisely the opposite factual finding, concluding that "Caesars [] decided to reroute all bus tours to its other properties so as to . . . attract more affluent high rollers, therefore sending the bus tour clientele elsewhere to play the slots."  (Arbitrator's Award at 5.)

    [9]  For example, it is well-settled that "[w]here a contractual ambiguity exists it is within the province of the arbitrator to interpret the ambiguous phrase."  Exxon Shipping Co., 993 F.2d at 1296.  As the preceding analysis makes clear, however, the Arbitrator's interpretation of the CBA at issue in this matter does not construe an even arguably ambiguous provision, but instead contradicts the plain language of the agreement.

citations omitted).  The Court, however, is not "entitled . . . simply to 'rubber stamp' the interpretation[] . . . of [the] arbitrator[]," Matteson, 99 F.3d at 114, because the parties herein also bargained for an interpretation of the CBA that is not "totally unsupported by principles of contract construction," Exxon Shipping Co., 73 F.3d at 1295, and that draws its essence from, and that does not rewrite, the CBA.  See National Ass'n of Letter Carriers, 272 F.3d at 185.  Because, as a matter of law, the Arbitrator's award does not draw its essence from the CBA, the Court will grant Plaintiff's motion for summary judgment and will deny Defendant's cross-motion for summary judgment.

## IV.  CONCLUSION

For the reasons discussed above, the Court will grant Plaintiff's motion for summary judgment, vacating the Arbitrator's award dated October 25, 2007, and will deny Defendant's cross-motion for summary judgment.  The accompanying Order will be entered.

**March 3, 2009**                          **s/ Jerome B. Simandle**
Date                                        JEROME B. SIMANDLE
                                            United States District Judge